IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| IZATULLO KHOSHMUKHAMEDOV, et al. | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| | * | |
| v. | * | Case No. 12-cv-0820-AW |
| | * | |
| STATE FARM FIRE AND | * | |
| CASUALTY COMPANY, | * | |
| | * | |
| Defendant. | * | |
| | * | |

***************************************************************************

## **MEMORANDUM OPINION**

Plaintiffs Izatullo Khoshmukhamedov and Zoulfia Issaeva filed this case against State Farm Fire and Casualty Company (State Farm) on March 15th, 2012, based on State Farm's refusal to pay Plaintiffs under a homeowner's insurance policy for losses sustained when water pipes burst and Plaintiffs' home was flooded. Pending before the Court is Plaintiffs' Motion for Partial Summary Judgment on Count 1 (Declaratory Judgment) and Summary Judgment on Count 2 (Breach of Contract).[1] Doc. No. 27. Also pending before the Court is State Farm's Cross-Motion for Summary Judgment on both counts. Doc. No. 32. The Court has reviewed the motion papers and exhibits and concludes that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2011). For the reasons articulated below, Plaintiffs' motion will be **DENIED** and Defendant's motion will be **GRANTED.**

---

[1] The difference between Plaintiffs' claims is not apparent to the Court. Plaintiffs' declaratory judgment claim seeks to declare State Farm liable, while they move for summary judgment on only the liability element of their breach of contract claim.

1

**I. FACTUAL AND PROCEDURAL BACKGROUND**

The following facts are drawn from the parties' briefs and attached exhibits and are undisputed, unless otherwise noted. In 2005, Plaintiffs purchased a home located at 12909 Brushwood Terrace in Potomac, Maryland. Plaintiffs eventually moved into the home in January or February of 2006. Doc. No. 27-3, Khoshmukhamedov Dep. at 59:12-14, 65:8-12. Plaintiffs moved their personal property to the Potomac house from their previous home in Rockville, Maryland. *Id.* at 65:8-12. They insured the Potomac house with State Farm. Doc. No. 27-2, State Farm Policy.

Plaintiff Khoshmukhamedov manages a business that supplies raw materials for the aluminum industry. His company primarily provides materials to an aluminum factory in Tajikistan. Doc. No. 27-3, at 37:1-11. Khoshmukhamedov's business requires that he frequently travel; the company is headquartered in Switzerland and has employees in Switzerland and Russia. Doc. No. 27-3, at 38:1-39:19. Plaintiffs are Russian citizens, and Khoshmukhamedov's visa prevents him from staying in the United States for more than 180 consecutive days. Doc. No. 27-3, at 54:16-19.

In 2008, Plaintiffs resided at the Potomac house in the first quarter of the year, and then again for a period beginning in September or October and concluding at the end of October. Doc. No. 27-3, at 109:7-110:21. When Plaintiffs left at the end of October, they intended to return to Maryland in February 2009, when Khoshmukhamedov planned to attend a conference in the United States. Doc. No. 27-3, at 111:2-8. Additionally, Plaintiffs intended to bring their grandson to live at the Potomac home and attend a local school. Doc. No. 27-3, at 165:21-166:2. Plaintiffs planned for their son and grandson to eventually live in a second home on the same property, or alternatively, on a nearby property. Doc. No. 27-4, Issaeva Dep. at 24:21-26:11. Because they

planned to return, Plaintiffs left many of their personal effects at the Potomac House; the house was furnished, and a car was left in the garage. Doc. No. 27-9, Immerman Dep. at 78:1-12; 171:14-18.

When Plaintiffs left in October 2008, they arranged for Mikhail Immerman, their friend and translator, and Khushi Kalotra,[2] their neighbor, to monitor and care for the Potomac house. Doc. No. 27-8, Immerman Dep. at 41:13-21; Doc. No. 27-10, Kalotra Dep. at 36:1-39:17. Kalotra and Immerman were both given keys to the residence. Doc. No. 27-8, at 41:19-21; Doc. No. 27-10, at 36:1-39:17. Once a week, Kalotra would gather the mail and deposit it in the house. Doc. No. 27-10, at 36:1-39:17. Occasionally, Kalotra would perform additional tasks, like fixing a broken screen and installing a dehumidifier. *Id.* at 39:14-41:8; 47:15-18. Immerman visited the residence two or three times per month while the Plaintiffs were gone, inspecting both the inside and the outside of the home. Doc. No. 27-8, at 36:1-37:14, 57:2-17. Immerman would check the mail, pay their bills, inspect the outside of the house for damage or intrusion, inspect the inside of the house for leaks, and shovel snow from the driveway. *Id.* at 36:14-38:8.

Upon leaving in October 2008, Plaintiffs had their cable television and telephone services shut off. Doc. No. 27-3, at 125:16-126:17. Khoshmukhamedov also instructed Immerman to have the electricity shut off. *Id.* at 120:7-22. Khoshmukhamedov believed that upon turning the electricity off, the house would not have heat. Doc. No. 32-2 Ex. 1 at 116:1-3. Immerman contacted Potomac Electric Power Company (PEPCO) to disconnect power to the residence, and he received a confirmation number for the request. Doc. No. 27-8, at 110:4-10. Immerman passed the confirmation number along to Khoshmukhamedov. Doc. No. 27-3, at 120:11-18. The pump that supplied water to the Potomac house ran on electricity, leading Khoshmukhamedov to

---
[2] In their briefs, the parties have spelled Kalotra's first name as both "Kushi" and "Khushi."

3

believe that water would not flow through the piping in the house in the absence of electricity. *Id.* at 111:9-112:3.

Despite these efforts, the water pump continued to receive electricity throughout the winter. Doc. No. 27-11, State Farm Denial of Coverage Letter, at 2. At some point prior to February 6th, 2009, water pipes in the house froze and burst. *See id.* at 1. The electric water pump continued to pump water into the house, causing significant damage to both the home and Plaintiffs' personal effects. Doc. No. 27-8, at 70:1-84:1. Kalotra discovered the damage on February 6th, and upon entering, shut off the electricity and the water. Doc. No. 27-10, at 70:4-21. Kalotra then hired workers to remove the Plaintiffs' personal effects from the house. *Id.* at 73:14-80:4.

Immerman, acting as the Plaintiffs' representative, contacted State Farm to file a claim soon after the damage was discovered. Doc. No. 27-8, at 89:3-13. State Farm sent an agent, James McDade, and an engineer, Robert G. Bryant, Jr., to the house to perform an inspection. Doc. No. 27-11, at 1-2. Upon discovering that the Plaintiffs had not been at the Potomac house since October, State Farm denied the Plaintiffs' claim on grounds that the home was "vacant/unoccupied" at the time of the damage. *Id.* at 2. The relevant portions of the insurance policy, cited by State Farm as the reason for its denial of coverage, state as follows:

**SECTION I - LOSSES INSURED**

**COVERAGE A - DWELLING**

We insure for accidental direct physical loss to property described in Coverage A, except as provided in **SECTION I - LOSSES NOT INSURED.**

**COVERAGE B - PERSONAL PROPERTY**

We insure for accidental direct physical loss to property described in Coverage B, except as provided in **SECTION I - LOSSES NOT INSURED.**

4

**SECTION I - LOSSES NOT INSURED**

1. We do not insure for any loss to the property described in Coverage A which consists of, or is directly and immediately caused by, one or more of the perils in items a. through n. below, regardless of whether the loss occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:

\* \* \* \*

b. freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system, or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. **This exclusion only applies while the dwelling is vacant, unoccupied or being constructed**. This exclusion does not apply if you have used reasonable care to:

(1) maintain heat in the building; or

(2) shut off the water supply and drain the system and appliances of water;

\* \* \* \*

f. continuous or repeated seepage or leakage of water or steam from a:

(3) plumbing system, including from, within or around any shower stall, shower bath, tub installation, or other plumbing fixture, including their walls, ceilings or floors; which occurs over a period of time...

Doc. No. 32 Ex. 4, at 12, 14 (emphasis added).

Following State Farm's denial of coverage, Plaintiffs filed this action. The parties agree that the dispositive issue for the purposes of the pending motions is whether the home was "unoccupied" at the time the damage was sustained.

**II. STANDARD OF REVIEW**

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). The Court must "draw all justifiable

inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). In ruling on a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Okoli v. City of Baltimore*, 648 F.3d 216, 231 (4th Cir. 2011) (quoting *Anderson*, 477 U.S. at 255).

To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if, after reviewing the record as a whole . . . a reasonable jury could return a verdict for [the non-moving party]." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citing *Anderson*, 477 U.S. at 248). Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his favor, a nonmoving party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

**III. ANALYSIS**

The Court will begin by addressing Plaintiffs' argument that the word "unoccupied" is ambiguous. In Maryland, if a term in an insurance contract is ambiguous, and if ambiguity remains after consideration of parol or extrinsic evidence, that term must be construed against the insurer as the drafter. *Cheney v. Bell Nat'l Life Ins. Co.*, 556 A.2d 1135, 1138 (1989). A contractual term is ambiguous "if, when read by a reasonably prudent person, it is susceptible of

6

more than one meaning." *Calorimis v. Woods*, 727 A.2d 358, 363 (1999); *Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 578 A.2d 1202, 1208 (1990); *Auction & Estate Reps., Inc. v. Ashton*, 731 A.2d 441, 444-45 (1999).

Maryland law commands that we reject Plaintiffs' assertion of ambiguity. Twice, the Court of Appeals of Maryland has ruled on the meaning of the word "unoccupied" in an insurance contract, and in neither case did the court conclude that the term was ambiguous. In *Agricultural Insurance Co. of Watertown, N.Y. v. Hamilton*, 33 A. 429 (1895) and *Norris v. Connecticut Fire Insurance Co. of Hartford*, 80 A. 960, 961 (1911), which both involved "vacant or unoccupied" language substantially similar to the language in question here, the Maryland high court found that there was but one definition of unoccupied:

> [A] designated tenement becomes unoccupied when it is no longer used for the accustomed and ordinary purposes of a dwelling or place of abode. Hence, no matter what other use it may be devoted to, so long as it ceases to be a place of actual abode,--a place really occupied as a residence or habitation,--it is vacant or unoccupied, according to the plain import of those words, and according, too, to the sense in which they are manifestly employed in the contract of insurance.

*Norris*, 80 A. at 961 (quoting *Hamilton*, 33 A. at 429). Hence, under Maryland law, there can be only one interpretation of the word "unoccupied" as written into an insurance contract. There is no ambiguity.

The definition put forth in *Hamilton* and *Norris* makes it clear that the Potomac house was unoccupied when the damage was sustained. Plaintiffs had not actually been residing in the house for approximately four months when the pipes burst. Doc. No. 27-3, at 109:7-110:21; Doc. No. 27-10, at 70:4-21. Plaintiffs put forward no evidence that any individual had slept in the home for even a single night after their departure. Most importantly, Plaintiffs' behavior

7

served to make the home virtually uninhabitable during their absence. They turned off the cable and phone service, and instructed Immerman to turn off the electricity, which would subsequently have prevented the house from receiving water or heat. Doc. No. 27-3, at 111:9-112:3, 125:16-126:17; Doc. No. 32-2 Ex. 1 at 116:1-3. Plaintiffs believed that they had left their home with no cable, telephone, electricity, heat, or water—a condition that would have made it impossible for *anyone* to use it for the accustomed and ordinary purposes of a dwelling or place of abode.

A comparison of the facts in the instant action to the facts in *Hamilton* and *Norris* further supports the proposition that Plaintiffs' home was unoccupied. In *Hamilton*, an employee of the house's owner slept in the house in the week before it burned; prior to that week, employees and the son of the house's owner occasionally slept on the premises. *Hamilton,* 33 A. at 430. In addition, the owner's wife would come to the house daily to pick up provisions that she had stored there. *Id.* Despite the frequenting of the property, the *Hamilton* court determined that the home was unoccupied. In this case, no one had slept in the Potomac house in the months between the Plaintiffs' departure and the incursion of the damage, and the house was visited far less frequently. Doc. No. 27-10, at 36:1-39:17; Doc. No. 27-8, at 36:1-37:14, 57:2-17. In *Norris*, where the Court of Appeals similarly determined that the home in question was unoccupied, the plaintiffs were only gone for about three weeks; here, Plaintiffs were gone for three to four months at the time of the damage. Doc. No. 27-3, at 109:7-110:21; Doc. No. 27-10, at 70:4-21.

Plaintiffs rely on two specific facts to distinguish the instant action from *Hamilton* and *Norris*. The first is that Plaintiffs plausibly had a firm intent to return in February of 2009. Plaintiffs aver that the home never became unoccupied because they still fully intended to use it

8

as their place of abode when they returned from abroad. Nonetheless, the *Hamilton* court was clear in declaring that intent to return is not relevant in determinations of unoccupancy:

> The element of a fixed abode is an essential ingredient of every concept of occupancy when applied to a dwelling house, and the term "unoccupied" is employed to express the directly opposite condition. A political or a commercial residence does not necessarily involve an actual occupancy of a particular place. Such a residence is largely a question of intention; whereas an **occupancy of a particular place as a dwelling is not a matter of intention at all, but purely one of fact**, and is absolutely inseparable from an actual, obvious abiding or living there. The insurance policy has a manifest reference to a continuous physical condition of the house as a habitation, and not to the mental purpose or mere intention of the owner with respect to what he considers his residence.

*Hamilton*, 33 A. at 431 (emphasis added). The *Norris* court provides a concrete example of this, finding that "when the occupant of a dwelling house moves out with his family, taking part of his furniture and all the wearing apparel of the family and makes the place of his abode in another town, **although he may have an intention of returning in eight or ten months**, such dwelling house while thus deserted must be regarded as unoccupied." *Norris*, 80 A. at 961 (citing *Sleeper v. N.H. Fire Ins. Co.*, 56 N.H. 401 (1876)) (emphasis added). Hence, that Plaintiffs intended to eventually return to the home does not create a genuine issue of material fact.

Second, Plaintiffs argue that this case can be distinguished from *Norris* and *Hamilton* because they left substantial personal property on the premises. This argument is based on a misreading of those cases. The *Hamilton* court cites, in approval, to several cases from other jurisdictions where courts determined that homes were unoccupied despite the fact that furniture or other personal property was left in the home. *Hamilton*, 33 A. at 431 (citing *Herrman v. Adriatic Fire Ins. Co.*, 85 N.Y. 162 (1881), *Moore v. Phoenix Fire Ins. Co.*, 6 A. 27 (N.H. 1886), and *Sexton v. Hawkeye Ins. Co.*, 28 N.W. 462 (Iowa 1886)). In fact, the plaintiffs in *Hamilton* left beds, a trunk containing clothing, and 50 bushels of wheat, and the court still determined that

the house was unoccupied. *Hamilton,* 33 A. at 431. Hence, that Plaintiffs left a substantial amount of personal property on the premises does not render the home occupied.

Given that occupancy is "absolutely inseparable from an actual, obvious abiding or living" in the insured premises, no reasonable jury could find that the Potomac house was occupied at the time the damage was sustained. *Hamilton*, 33 A. at 431. Given Plaintiffs' extended absence from the home, the cutting off of utilities, the infrequency of visits to the home, and the complete lack of overnight stays, there is no genuine issue of material fact that the home was unoccupied at the time it sustained water damage.

### IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment will be **DENIED**, and Defendant's Motion for Summary Judgment will be **GRANTED**. A separate Order will follow.

__May 28, 2013__  
Date

/s/  
Alexander Williams, Jr.  
UNITED STATES DISTRICT JUDGE